Karen S. RUSSO, Individually and as Administrator of the Estate of Thomas Bubenhofer, et al., Plaintiffs–Appellees, Cross–Appellants,

v.

CITY OF CINCINNATI, et al., Defendants, Cross–Appellees,

Richard Sizemore, Defendant–Appellant.

Nos. 90–3432, 90–3936.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 8, 1991.

Decided Jan. 15, 1992.

---

Steven M. Magas (argued), Thomas R. Smith (briefed), Cincinnati, Ohio, for petitioners-appellees, cross-appellants and plaintiffs-appellees.

William M. Gustavson (argued & briefed), Richard H. Castellini (briefed), City Solicitor's Office, Donald E. Hardin (briefed), Swain, Hardin & Hill, Cincinnati, Ohio, for defendants, cross-appellees and defendant-appellant.

Before JONES and SUHRHEINRICH, Circuit Judges; and WELLFORD, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

On January 6, 1988, plaintiffs-appellees, the estate and family of Thomas Bubenhofer, filed a complaint seeking relief under 42 U.S.C. § 1983 (1988) against defendants-appellants, Police Sergeant Richard Sizemore, Police Officer Robert Burch Scholl, Police Specialist Sandra Lemker, and the City of Cincinnati for the shooting death of Thomas Bubenhofer. The plaintiffs alleged three theories of recovery: (1) that the officers' warrantless entry into Bubenhofer's apartment violated his constitutional rights; (2) that the officers' use of force was excessive; and (3) that the City of Cincinnati's ("City's") failure to train adequately its officers proximately caused these deprivations of Bubenhofer's rights.

On April 16, 1990, the district court granted summary judgment for the City on the failure to train claim and for Lemker and Scholl on the excessive force claim. The court also granted summary judgment on the unlawful search claim but denied summary judgment as to Sizemore on the excessive force claim. In the present action, Sizemore appeals the district court's denial of summary judgment on the claim of excessive force, and plaintiffs appeal the grant of summary judgment as to all other defendants and claims. For the reasons that follow, we affirm in part and reverse in part.

I.

On February 6, 1987, Cincinnati police officers shot thirty-seven-year-old Thomas Bubenhofer. Bubenhofer died the next morning as a direct result of the shooting.

Prior to the shooting, Bubenhofer had been under the occasional care of physicians at the Rollman Psychiatric Institute ("RPI") and was diagnosed a paranoid schizophrenic. On February 6, 1987, RPI granted Bubenhofer a two-hour leave pass. Bubenhofer was picked up from RPI by his sister Karen Russo at approximately 11:45 a.m., who took him to his apartment at 323 Terrace Avenue in Cincinnati, Ohio. Soon thereafter, Bubenhofer stated he did not wish to return to RPI and left the apartment. Russo reported his actions to RPI, which immediately notified the Cincinnati Police Department. The Department, in turn, broadcast over police radio that Bubenhofer was a walk-away from RPI who was "suicidal, homicidal, and a hazard to police." J.A. at 712.

At approximately 7:30 that evening, Russo and her brother, Don Bubenhofer, returned to Thomas Bubenhofer's apartment. Dennis Bauer, the building manager, unlocked the apartment door for Russo and Don Bubenhofer, who saw a figure under the bedcovers in the bedroom they assumed was Thomas. The three then left the apartment and called the Cincinnati Police for assistance in returning Thomas Bubenhofer to RPI.

Officer Scholl arrived at the apartment at 7:52 p.m., followed soon thereafter by Officers Lemker and Sizemore. All three officers had heard the police broadcast on

Bubenhofer and were therefore aware that Bubenhofer was potentially dangerous. After being told by Russo that Bubenhofer was alone in his apartment and did not have a gun, the three officers entered the apartment building, followed by Russo, Bauer, and Don Bubenhofer. Sizemore carried a Taser, and all three officers were armed with service revolvers.[1] Placing themselves on the landing outside of Thomas Bubenhofer's apartment door, the officers notified Bubenhofer of their presence and asked him to open the door. He replied that he wanted to be left alone and threatened to kill anyone who entered the apartment.

Officer Alan March arrived at 7:57 p.m. and took up a position outside the building near a window looking into Bubenhofer's illuminated apartment. March reported by radio that the apartment door was blocked by a couch, and that Bubenhofer was holding the lock bolt with a pair of pliers to prevent the opening of the door with a key. March also reported that Bubenhofer had two butcher knives on a table nearby. At the request of one of the officers, Bauer attempted to open the door with a pass key, but was unsuccessful. The officers attempted to have March distract Bubenhofer from the door so that they could open it. This also proved fruitless. At one point, a conversation involving provoking language took place between the officers and Thomas Bubenhofer.

Suddenly, Bubenhofer opened the door to his apartment and stood in the doorway. He held a knife in each hand with the blades pointed at the officers. Officers Lemker and Scholl drew their revolvers and told Bubenhofer to drop the knives. Bubenhofer stood silently in front of them for a number of seconds, then quickly closed the door.

After Don Bubenhofer objected to the officers' show of force, he, Russo, and Bauer were ordered to leave the building. Without the officers' knowledge, Bauer concealed himself on a landing immediately inside the entrance door to the building and a few steps lower than the landing outside Bubenhofer's apartment.

Following the removal of Russo and Don Bubenhofer, Thomas Bubenhofer continued to make threats against the officers. Defendants also contend that Bubenhofer at this point threatened to take his own life, a claim that both Russo and Bauer dispute. Moments later, the apartment went dark and Bubenhofer fell silent.

At this point, Sizemore decided to force the apartment door, which swung open approximately four to six inches. Within moments, Thomas Bubenhofer fully opened the door. According to Sizemore, Bubenhofer stood just inside the doorway, holding a knife in each hand in essentially the same position as in his first encounter with the officers. Bauer, however, testified that from his vantage point below the landing, Bubenhofer appeared to be in a crouched position, resting on the backs of his heels.

Upon seeing Bubenhofer, Sizemore fired a Taser dart. The dart struck Bubenhofer's midsection, and he began to shake and falter. Bubenhofer then appeared to shake off the effects of the Taser, whereupon Sizemore fired a second dart. Again Bubenhofer appeared stunned. Once again, however, Bubenhofer overcame the effect of the Taser and rushed toward Sizemore, both knives pointed at him. Officers Lemker and Scholl immediately fired their revolvers several times at Bubenhofer, who lurched into Sizemore and then fell down six or seven steps to a small landing by the front door of the building. At this point, Bubenhofer was lying at the bottom of the stairwell holding one knife, and the officers stood on the landing above him.

The officers repeatedly asked Bubenhofer to drop the knife. They also told him

---

**1.** The term "taser" refers to an electronic device used to subdue violent or aggressive persons. It is classified as a firearm by the federal government. The Taser is a battery-charged unit approximately the size and appearance of a flashlight. It holds two cartridges, each containing a hooked barb, or dart, attached to the cartridge by a long, electricity-conducting wire. Each dart can be fired independently by depressing the corresponding lever located on the frame of the Taser. By continuing to press on the lever, a high voltage electrical current is transmitted through the wire to the target.

they had help for him, and that they would send him to a hospital.

According to defendants, Bubenhofer managed to get up, whereupon Sizemore fired another Taser dart, hitting Bubenhofer in the face. Although it seemed to have some initial effect, Bubenhofer again appeared to shake off its effects, at which point Sizemore fired a fourth dart at Bubenhofer. The officers claim that Bubenhofer then charged up the steps at them, knife in hand. Lemker and Scholl fired their revolvers several times. Bubenhofer fell back down the steps. He remained conscious and still had a knife in one hand.

Again the officers sought to persuade Bubenhofer to drop the knife. At one point, Bubenhofer put down the knife, then picked it back up. The officers claim that soon thereafter, Bubenhofer again stood up and began to come up the stairs, knife in hand, at which point all three officers fired at Bubenhofer. Bubenhofer fell back down to the bottom of the stairs. Plaintiffs deny that Bubenhofer ever stood up or charged towards the officers, relying upon the testimony of Robert Kean, a neighbor who witnessed some of the incident, apparently from his house looking through a window onto the stairway.

After the third round of shots, Bubenhofer lay still, at which point a rescue unit entered. Thomas Bubenhofer was taken to a nearby hospital, where he died at 1:25 a.m. He had been shot a total of twenty-two times.

On September 25, 1987, the Cincinnati Office of Municipal Investigation filed a report stating that Sizemore did not follow proper police procedure in that (1) he should have considered Bubenhofer a "barricaded person" within the meaning of section 12.175 of the Cincinnati Police Division Procedure Manual ("C.P.D.P.M.") and accordingly requested the assistance of a S.W.A.T. team, and (2) that Sizemore's use of the Taser did not comport with section 12.546 of the C.P.D.P.M., which states in relevant part: "Officers should obtain sufficient back-up prior to using the Taser to control the suspect. Personnel should be deployed in such a manner that would en-

able them to use other appropriate means to subdue the suspect if the Taser is ineffective." J.A. at 381. The report concluded that "[a]ny reasonable person would conclude that Tom Bubenhofer should have been considered a barricaded person and if forced into a confrontation would respond violently." *Id.*

The report also concluded that the use of the revolvers by the officers was justified by the need for self-defense. Finally, the report concluded that, based on interviews with the officers, "recruit training regarding the mentally ill appears inadequate, in-service training is virtually non-existent and although the police division procedure manual is specific regarding the operational aspects such as dealing with barricaded person, there are no procedures or methods for interviewing mentally ill individuals." *Id.* at 384.

The district court granted summary judgment for all three officers on plaintiffs' claim that breaking into Bubenhofer's apartment violated the Fourth Amendment's proscription against unreasonable searches, concluding that exigent circumstances existed justifying the officers' actions. The court granted summary judgment to Lemker and Scholl on the excessive force claim, finding their use of firearms justified. The court granted summary judgment to the City on plaintiffs' failure-to-train claim, finding that plaintiffs were unable to show "deliberate indifference" to officer training. Finally, the court denied summary judgment to Sizemore on the claim that his use of the Taser constituted excessive force.

## II.

We review a district court's grant of summary judgment *de novo.* *Vollrath v. Georgia–Pacific Corp.,* 899 F.2d 533, 534 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 345, 112 L.Ed.2d 310 (1990). We also adopt the standard set forth in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (cited with approval in *Curry v. Vanguard Ins. Co.,* 923 F.2d 484, 485 (6th Cir.1991)), which held that, in a motion for summary

judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. The standard of review in any given case, however, turns in part on the underlying substantive dispute, as "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.*

■ To successfully state a claim under 42 U.S.C. § 1983, a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988). The plaintiffs here assert two claims against the police officers as individuals: (1) that the breaking down of Bubenhofer's door without a warrant constituted an unlawful search in violation of the Fourth Amendment; and (2) that the officers' "tasering" and shooting of Bubenhofer constituted an excessive use of force. In response, all three officers assert qualified immunity.

*Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), established that police officers enjoy qualified immunity from suits brought under § 1983. In *Harlow v. Fitzgerald,* 457 U.S. 800, 816–18, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Court eschewed a subjective qualified immunity standard and held instead that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986), extended the rule articulated in *Harlow* to hold that police officers are entitled to qualified immunity unless, "on an objective basis, it is obvious that no reasonably competent officer would have concluded that [the conduct was lawful]; but if

officers of reasonable competence could disagree on this issue, immunity should be recognized."

The Court's most recent major pronouncement on the law of qualified immunity as it relates to police officers stands in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The *Anderson* Court faced a plaintiff who had successfully argued at the appellate level that the "clearly established law" violated in his case was the Fourth Amendment's proscription of illegal searches and seizures. In reversing the appellate court's determination, the Court stated two important principles of law.

First, noting that the operation of the qualified immunity standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified[,]" the Court held that, in order for a plaintiff to make a successful claim, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 639–40, 107 S.Ct. at 3039. Although it need not be the case that "the very action in question has previously been held unlawful, ... in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 640, 107 S.Ct. at 3039 (cited with approval in *Danese v. Asman,* 875 F.2d 1239, 1242 (6th Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990)).

Second, while reaffirming that a subjective inquiry has no place in the qualified immunity analysis, the Court clarified that the reasonableness of the officer's action must be evaluated in light of the information that the defendant officer possessed at the time of the act, thus often requiring an "examination of the information possessed by the ... officials." *Id.* at 641, 107 S.Ct. at 3034.

In light of *Anderson,* we have addressed the standard for determining whether the law in a given area is clearly established to a degree sufficient to rebut a claim for qualified immunity, and have held that,

in the ordinary instance, to find a clearly established constitutional right, a district

court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir.1988).

■ When a claim to qualified immunity is raised within the context of a motion for summary judgment, the non-movant must allege facts sufficient to indicate that the act in question violated clearly established law at the time the act was committed. *See Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir.1987) (holding that plaintiff is obliged to present facts that, if true, would constitute violation of clearly established law). Thus, the plaintiff must effectively pass two hurdles when facing a defendant on summary judgment who claims qualified immunity. First, the allegations must "state a claim of violation of clearly established law." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). Second, the plaintiff must present "evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts." *Id.* At the summary judgment stage, whether the legal violation alleged was clearly established at the time of the incident, as well as whether a genuine issue of material fact exists as to whether the alleged violation occurred, are questions of law for the court. *Dominque*, 831 F.2d at 677.

## A. Search and seizure claim.

In granting summary judgment to all three officers on the claim that forcing open Bubenhofer's apartment door constituted an unreasonable search in violation of the Fourth Amendment, the district court found that "on an objective basis and as a matter of law these officers could have reasonably believed that a search of the apartment was lawful, to prevent suicide and return [Bubenhofer] to RPI." J.A. at 25.

■ Under prevailing Supreme Court precedent, police officers must either have probable cause or exigent circumstances must exist before a warrantless, forcible entry into a private residence may be made for search or felony arrest purposes. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). We have recently clarified that "[t]he exigent circumstances exception relies on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant." *U.S. v. Radka*, 904 F.2d 357, 361 (6th Cir.1990). This court reviews *de novo* the district court's legal conclusions with respect to the issue of exigency. *Id.*

■ At the time of Sizemore's entry, it is uncontested that Sizemore understood: (1) that Bubenhofer was mentally disturbed; (2) that Bubenhofer had two large knives in his possession; (3) that the police radio transmission had described Bubenhofer as "suicidal"; and (4) that immediately before Sizemore forced open the door, Bubenhofer had turned out the lights and fallen silent. Taken together, we find that these uncontroverted facts may have led Sizemore to believe that Bubenhofer was in danger of committing suicide, thus convincing him that immediate entry into the apartment was necessary.

Plaintiffs counter that Sizemore's actions were nevertheless unreasonable, particularly in light of a department policy that officers request S.W.A.T. assistance when confronted with "barricaded" person such as Bubenhofer. Whether Sizemore acted unreasonably is, we believe, a close question. Where qualified immunity is asserted, however, the reasonableness of an officer's actions is only one part of the inquiry. To prevail, plaintiffs must also show that, under clearly established law, exigent circumstances did not exist such as to justify the officers' forcible entry into Bubenhofer's

apartment, and that Sizemore reasonably should have known this. Plaintiffs fail to cite a single case indicating that an officer's attempt to rescue what that officer believes to be a suicidal person does not constitute exigent circumstances, nor are we aware of such precedent. Although the fact that Sizemore may have violated established police procedure certainly makes our task more difficult, the Supreme Court has indicated that the violation of established procedure alone is insufficient to overcome a qualified immunity claim. *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) (holding that officials sued for constitutional violations do not lose qualified immunity simply because their actions violate statutory or administrative procedure).

We conclude, therefore, that the district court properly granted summary judgment against plaintiffs on the illegal search and seizure claim.

**B. Excessive force claims.**

■ The use of excessive or unreasonable force by police officers in the exercise of their authority gives rise to a § 1983 cause of action. *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 1867, 104 L.Ed.2d 443 (1989), the Supreme Court held that excessive force claims are to be analyzed under the Fourth Amendment's reasonableness standard rather than under the Due Process Clause of the Fourteenth Amendment. The Court further clarified that the reasonableness inquiry in an excessive force action is an objective one, which should disregard the underlying intent or motivation of the defendant. To determine whether exigent circumstances exist, a court should look to the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. at 1872; *see also Lewis v. City of Irvine*, 899 F.2d 451 (6th Cir.1990) (embracing the analysis in *Graham*); *McDowell v.*

*Rogers*, 863 F.2d 1302, 1307 (6th Cir.1988) ("[O]ur court has repeatedly found that a totally gratuitous blow with a policeman's nightstick may cross the constitutional line ..."). Plaintiffs advance three distinct excessive force claims. We review the claims seriatim.

**1. *The initial use of the Taser.***

■ At the time of Sizemore's initial use of the Taser, Bubenhofer stood facing the officers a few feet within his apartment doorway with a knife in each hand. Sizemore knew that Bubenhofer was potentially homicidal and suicidal.

Plaintiffs rely on the testimony of Bauer to contend that Bubenhofer in no way threatened the officers prior to the initial discharge of the Taser, and to suggest that Bubenhofer may have even been sitting on the backs of his heels at this point. Furthermore, plaintiffs point out that Sizemore's use of the Taser violated official policy, because section 12.546 of the C.P.D.P.M. states in relevant part that "[o]fficers should obtain sufficient back-up prior to using the Taser to control the suspect. Personnel should be deployed in such a manner that would enable them to use other appropriate means to subdue the suspect if the Taser is ineffective."

Our review of the uncontested facts, however, leads us to conclude that, although plaintiffs' allegations may raise a genuine issue of material fact as to whether the use of the Taser was reasonable, plaintiffs have failed to show that clearly established law at the time of the incident declared such actions unconstitutional, or that an officer in Sizemore's position would reasonably have known that his conduct transgressed constitutional law. Sizemore was aware that Bubenhofer was armed with knives, that he had made a number of threatening statements to the officers, and that RPI considered him potentially homicidal. The uncontested record indicates that Sizemore deployed the Taser in an effort to obviate the need for lethal force. Although in hindsight his choice proved tragic, we cannot say that Sizemore's use

of non-lethal force to subdue a potentially homicidal individual transgressed clearly established law. We therefore conclude that the district court erred in refusing to grant summary judgment to Sizemore with respect to plaintiffs' claim that the initial use of the Taser constituted excessive force.

### 2. The subsequent use of the Taser.

■ The district court found, and all the parties agree, that Sizemore fired the Taser at Bubenhofer while he lay at the bottom of the stairwell, that the dart struck Bubenhofer in the face, and that at this point Bubenhofer posed no immediate threat to the officers. The district court reasoned that "[i]t should have been clear [to Sizemore] after its first use under an objectively reasonable standard that the use of the Taser gun effectively escalated the incident instead of preventing a suicide or inducing Thomas Bubenhofer to surrender." J.A. at 28–29. The court thus held that, "[a]pplying the objective reasonableness test, the Court cannot conclude that the further use of the Taser by Sizemore ... was objectively reasonable.... Thus, this Court cannot declare that Sizemore is immune from suit in this regard as a matter of law." *Id.* at 32.

We suspect that the district court may have misapprehended the qualified immunity inquiry. As discussed above, the issue is not simply whether Sizemore acted in a reasonable manner, but also whether his actions violated clearly established law, and whether an officer in Sizemore's position would reasonably have known that his conduct was illegal. Although Sizemore's subsequent firings of the Taser present a closer question than his initial use of the Taser, we note again that his actions were intended to avoid having to resort to lethal force. While Sizemore's later uses of the Taser, after its initial ineffectiveness, might appear questionable, we cannot conclude that they constituted a show of excessive force. We conclude, therefore, that Sizemore was entitled to qualified immunity in his use of the Taser and, accordingly, reverse the district court's denial of summary judgment.

### 3. The use of deadly force.

■ We have recently had occasion to reaffirm that, under this court's clearly established precedent, a person has "a right not to be shot unless he [is] perceived to pose a threat to the pursuing officers or others." *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir.1988) (citing with approval *Garner v. Memphis Police Dep't*, 710 F.2d 240, 246 (6th Cir.1983), *aff'd and rem'd sub nom. Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

Bubenhofer was shot a total of twenty-two times by officers Lemker, Scholl, and Sizemore, even though he was armed only with knives. In addition, plaintiffs raise a genuine issue of fact as to whether, in the second and third round of discharges of the officers' revolvers, the officers may have shot Bubenhofer even though he posed no serious threat of physical harm. Finally, the record suggests that some ten to twelve minutes elapsed between the second and third series of shots, during which time Bubenhofer apparently dropped his knife. Given the current state of the record, we believe that a reasonable jury might conclude that the officers' repeated use of their revolvers violated this court's clearly established precedent on the use of deadly force. Therefore we find that summary judgment at this juncture was unwarranted.

Accordingly, we reverse the district court's grant of summary judgment as to all three officers with respect to the shooting of Bubenhofer.

### III.

■ As a final matter, plaintiffs allege that the City's failure to train adequately its police officers in the proper exercise of force on mentally disturbed individuals constitutes deliberate indifference to the rights of such persons.

The most recent pronouncement by the Supreme Court in the area of municipal liability in the § 1983 context is *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In *City of Canton,* the plaintiff, who had been

brought to the local police station by officers and thereafter slumped to the floor on two occasions, brought a § 1983 action against the city for failure to train its officers in recognizing when a person in their custody is in need of medical assistance. Pursuant to municipal regulations, shift commanders at the station were authorized to determine, in their sole discretion, whether a detainee required medical care. Shift commanders were provided with only first-aid training. *Id.* at 382, 109 S.Ct. at 1201. The Court held that

> the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.... Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983.

*Id.* at 388–89, 109 S.Ct. at 1204–05. In explicating its conception of "deliberate indifference," the Court added:

> The issue in a case like this one ... is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.' It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.* at 390, 109 S.Ct. at 1205.

To establish liability under *City of Canton*, "the plaintiff must prove ... that the training program at issue is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually

caused' the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir.1989) (citing *City of Canton*). Finally, we note that the City, unlike the individual officers in this case, is not entitled to any level of immunity; if the plaintiffs offered evidence that the training was inadequate within the meaning of *City of Canton*, then summary judgment was inappropriately granted.

The district court denied plaintiffs' claim against the city for failure to train police officers on the basis of the following evidence:

> The City of Cincinnati offers extensive training to its officers in the area of Human and Public Relations. It also offers a 6–7 hour training seminar to its officers entitled Disturbed–Distressed Persons. In addition, the Cincinnati Police Division Procedure Manual (CPDPM) provides guidance to officers in the handling of mentally-ill individuals and potential suicides. The record indicates that the Defendant officers had participated in the above offered training sessions.

J.A. at 34.

Plaintiffs contend that a genuine issue of material fact remains as to whether the offered training is adequate as a matter of law. First, plaintiffs point out that, although the officers conceded that they were frequently called upon to deal with mentally and emotionally disturbed and disabled individuals, none were able to give specific responses as to the content of their training. Plaintiffs also point to the Office of Municipal Investigation report of the Bubenhofer incident, which concluded:

> [B]ased on the testimonies [sic] of Sizemore, Lemker and Scholl, recruit training regarding the mentally ill appears inadequate, in-service training is virtually non-existent and although the police division procedure manual is specific regarding the operational aspects such as dealing with barricaded persons, there are no procedures or methods for interviewing mentally ill individuals or techniques for recognizing the mentally ill.

*Id.* at 384.

Finally, plaintiffs offer the testimony of George L. Kirkham, Ph.D., an expert in

police procedures. His review of the training offered by the City to police officers led him to conclude that

> none of the involved police personnel understood the appropriate procedures for reacting to mentally ill individuals, ... a failing which must inevitably be linked to deficient training. Notwithstanding the apparent fact that Sergeant Sizemore as well as Officers Lemker and Scholl had nominally received such training from the available case records, the conclusion is ineluctable that it was not of such a nature as would assure a proper understanding and appropriate response to a situation of this sort.

*Id.* at 425. We hold that plaintiffs have offered sufficient evidence to suggest that the training program for police officers offered by the City with respect to the use of force on mentally disturbed persons is constitutionally inadequate, that this inadequacy results from the City's deliberate indifference to the rights of such persons, and that this inadequacy may have directly resulted in Bubenhofer's death.

The City would have us disregard the "conclusory" statements of Kirkham, and argue in the alternative that, regardless of Kirkham's testimony, the simple fact that the officers had received some training in a course entitled "Disturbed–Distressed Persons" and that the Department had a policy of handling barricaded persons requires us to find that the training was adequate as a matter of law. To this we cannot agree.

As an initial matter, we do not believe the opinions of experts are to be given no weight by this court, as the City apparently urges. Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures. To disregard expert testimony in such cases would, we believe, carry with it the danger of effectively insulating a municipality from liability for injuries resulting directly from its indifference to the rights of citizens. Reliance on expert testimony is particularly appropriate where, as here, the conclusions rest directly upon the expert's review of materials provided by the City itself.

Similarly, we find the fact that the City offered a seven-hour course entitled "Disturbed–Distress Persons" insufficient in and of itself to shield the City from liability. Just as in *City of Canton,* where the officers were trained in an area that nominally addressed the needs of the relevant class of persons, but where the content and adequacy of that training was in dispute, we find that the City has not established that there exists no genuine issue of material fact as to the adequacy of the City's training. Although plaintiffs concede that the officers received the amount of training cited by the district court, they dispute that the *content* of the training was adequate. The City comes forth with no evidence to refute Kirkham's conclusion that the content of the training offered was inadequate. To uphold summary judgment to the City on this issue would, we believe, necessarily rest on the rule that a municipality may shield itself from liability for failure to train its police officers in a given area simply by offering a course nominally covering the subject, regardless of how substandard the content and quality of that training is. We do not believe that this is, or should be, the state of the law.

Finally, we disagree that the mere fact that the City had a policy of dealing with barricaded persons constitutes conclusive proof that it was not deliberately indifferent to the rights of individuals in Bubenhofer's position. We find instructive this court's holding in *Leach v. Shelby County Sheriff,* 891 F.2d 1241 (6th Cir.1989) *cert. denied,* 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990), where we found "more than sufficient evidence" of a policy of deliberate indifference to the rights of paraplegic prisoners where the plaintiff and at least fourteen other disabled prisoners received poor care while imprisoned. *Id.* at 1248. In *Leach,* we found that a municipality could be held liable for the deliberate indifference of its sheriff, despite the fact that the sheriff was required by statute to provide adequate care to all prisoners:

Given the district court's finding of deliberate indifference by the Sheriff in that at least 14 other paraplegics had received similar deplorable treatment, it is fair to say that the need for more adequate supervision was so obvious and the likelihood that the inadequacy would result in the violation of constitutional rights was so great that the County as an entity can be held liable here for the extent of [plaintiff's] ... damages.

*Id.*

In the case at bar, plaintiffs have offered sufficient evidence to raise a genuine issue of material fact as to whether the training offered by the City to its police officers on the use of force in handling mentally and emotionally disturbed individuals falls to the level of "deliberate indifference" under *City of Canton.* We therefore reverse the district court's grant of summary judgment to the City on plaintiffs' failure to train claim.

### IV.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to Officer Sizemore on the search and seizure claim, but REVERSE the denial of summary judgment to Sizemore on use of the Taser, REVERSE the grant of summary judgment to Officers Lemker, Scholl, and Sizemore on the use of lethal force, REVERSE the grant of summary judgment to the City on the failure to train claim, and REMAND for further proceedings consistent with this opinion.

WELLFORD, Senior Circuit Judge, concurring:

I am fully in accord with Judge Jones with respect to parts I and II of his opinion.

While concurring as to part III, I feel it appropriate to emphasize the narrow area of liability of the municipality on a claim of a failure to train adequately its police officers in dealing with unstable or mentally incompetent persons under the circumstances of this case. We have decided that the individual police officer defendants have qualified immunity with respect to the warrantless entry. The City incontestably

also has a "barricaded person" policy that applies in this type of situation. It is, therefore, clear on this record that the City may not be held liable on the warrantless entry claim because we have concluded that the exigent circumstances warranted the entry in this particular case. The officers harbored an objective and reasonable belief of potential suicide or serious harm being self-inflicted by Bubenhofer. The City may not, therefore, be liable on the seizure or entry claim based on a failure to train.

Nor can the City be liable for the defendant officers' use of the taser weapon. It is clear that the taser was designed to be used in this type of circumstance: to stun and to disable temporarily rather than to inflict more serious or more permanent injury. We have found it objectively reasonable to have used the taser under the circumstances confronting the officers. The City cannot be held liable, therefore, on the claim relating to the initial or subsequent use of the taser.

There remains the claim, dealt with in part III of the majority opinion, that the City allegedly failed to train its police force adequately in the proper use of force on mentally disturbed individuals. The remaining area of liability is confined to the actions of the officers, if inadequately trained within the meaning of applicable law, after Bubenhofer was drawn out of the apartment, weapon or weapons in hand, confronting the police officers on the scene. We have held that as a matter of summary judgment the officers were not entitled to qualified immunity in the repeated use of their pistols at short range upon Bubenhofer.

It seems to me that we can hold the City likewise not entitled to summary judgment in connection with this portion only of plaintiffs' claims. This essentially involves the issue whether the City has trained its police officers properly in the use of deadly force within the meaning of *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Here, the officers confronted an apparently violent individual, drawn out of his apartment involuntarily,

who threatened them with apparent immediate and serious bodily harm. The only factor making this case different from the numerous excessive force cases since *Garner* (see, *e.g.*, *Carter v. City of Chattanooga*, 850 F.2d 1119 (6th Cir.1988)), is that the subject of the police action here was known to be mentally disturbed.

The Court in *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), limited the application of the "failure-to-train" theory of recovery to cases " 'where the failure to train amounts to a deliberate indifference to the rights of persons with whom the [officers] come in contact.' " *Walker v. Norris*, 917 F.2d 1449 (6th Cir.1990) (quoting *Harris*, 489 U.S. at 388, 109 S.Ct. at 1204). It is only when this failure to train amounts to a "deliberate indifference" that such a failure can be said to be a "policy or custom," as defined by prior cases, that is actionable against a municipality under § 1983. *Harris*, 489 U.S. at 389, 109 S.Ct. at 1205.

Inadequate training may amount to a municipal policy only if "the need for more or different training is so *obvious*, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been *deliberately indifferent* to the need." *Id.* at 390, 109 S.Ct. at 1205 (emphasis added). In order to hold the City liable, the factfinder would have to find that the inadequacy of training was so likely to result in the constitutional injury to mentally ill persons, that the City's policymakers could be deemed to be callous and indifferent to the need for training in that area. I would add as a caveat in this type of case that it is not enough that an officer may be unsatisfactorily or insufficiently trained, because an inadequate training program may not necessarily be a proximate cause of the officer's deficiency in handling a particular emergency or confrontation. In any event, plaintiff must carry the heavy burden of proving the City's alleged policy of deliberate indifference and that the deficiency, if any, was a proximate cause of the death.

Dr. Kirkham, plaintiffs' expert, testified that the police officers did not know the appropriate procedures for this type of situation, and that this failing must have been "linked to" inadequate training. In my view, to maintain plaintiffs' claim against the City, plaintiffs must make a stronger showing than this. The Office of Municipal Investigation report, concluding that the training was inadequate based on the testimony of the officer-defendants, also concluded that training was virtually non-existent. The City, however, showed that it held a 6–7 hour seminar on how to deal with disturbed persons and engaged in extensive training in the area of human and public relations.

I agree with the majority opinion that this conflicting evidence presents an issue of material fact that requires the reversal of the district court's grant of summary judgment to the City but only in one aspect of plaintiffs' excessive force claim.

I would add that I am not sure that, under the circumstances of this violent confrontation, the factor of mental illness is a consideration. Whether one in Bubenhofer's position were deranged, drunk, under the influence of drugs, or merely angry and upset for unknown reasons may not be material. The question is whether the City adequately trained these officers to use potentially deadly force in confronting this general type of situation. I find this issue, like the others, close and difficult under the circumstances, but I opt to give plaintiff the benefit of doubt in this regard.

I concur in reversing the grant of summary judgment to the City in the limited respect indicated. I concur otherwise, without reservation, in parts I and II.

SUHRHEINRICH, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's opinion as to Parts I and II. However, I dissent from Part III, dealing with municipal liability for inadequate training.

The majority opinion correctly recognizes that claims of inadequate training brought under 42 U.S.C. § 1983 are governed by *City of Canton v. Harris*, 489 U.S. 378,

109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). *Harris* set forth three elements that must be proven to hold a municipality liable for inadequate training: (1) the training must, in fact, be inadequate; (2) the inadequacy must result from the municipality's deliberate indifference; and (3) the deliberate indifference must be closely related to or cause the constitutional violation complained of. *Id.* at 388–90, 109 S.Ct. at 1204–05; *accord Hill v. McIntyre,* 884 F.2d 271, 275 (6th Cir.1989).

In determining whether the training program was adequate, the focus must be on the program itself, not on whether a particular officer was adequately trained. *Harris,* 489 U.S. at 390–91, 109 S.Ct. at 1205–06. In support of its finding of sufficient evidence of inadequate training the majority improperly relies upon such officer-specific evidence. The majority relies on the appellants' submission that Officers Sizemore, Lemker, and Scholl "were [not] able to give specific responses as to the content of their training." This is precisely the sort of evidence that the Supreme Court regards as "say[ing] little about the training program or the legal basis for holding the city liable." *Id.* at 391, 109 S.Ct. at 1206.

Similarly, the expert testimony of Dr. Kirkham is of no evidentiary value in the instant case. Dr. Kirkham makes no specific findings regarding the program itself. Instead, he engages in the wild speculation that because the officers did not understand the appropriate procedures, the training program must be inadequate. This conjecture involves a leap that the Supreme Court has specifically forbidden. *Id.* at 390–91, 109 S.Ct. at 1206 (mere fact that a particular officer is inadequately trained is not sufficient as it might be that a sound program is occasionally negligently administered). Dr. Kirkham's conclusion is based solely on the conduct and circumstances of the particular officers involved in the instant case. To be evidence upon which a finding of inadequacy may be based, the conclusion must be based on

specifically perceived shortcomings of the training program itself.[1]

Finally, the appellants rely on the City of Cincinnati Office of Municipal Investigation ("OMI") report. This report concluded, based on interviews with officers Sizemore, Lemker, and Scholl, that the training program was inadequate. The interviews, however, revealed only that the officers were unable to recall the specifics of the training program. The report does not reveal any attempt to adduce the content of the training program. The OMI report thus suffers from the same deficiency as Dr. Kirkham's testimony, it focuses on the officers rather than the program.

The appellants claim that the training program was inadequate. A report that fails to determine the content of that program or the manner in which it was administered is no evidence of the adequacy of the program.

Even if the appellants' evidence were sufficient, the record does not even contain a hint that the asserted inadequacy resulted from the city's deliberate indifference. Claims of inadequate training test fundamental considerations of judicial restraint. First, when a federal court reviews municipal or state executive conduct or policy, as here, it must be very careful not to violate principles of federalism. Second, the federal judiciary must remain ever-mindful of its limited competence regarding executive functions, such as the formulation and administration of training programs.

In order to safeguard our system of federalism and limit the judiciary to the ambit of its competence, the Supreme Court imposed the exacting deliberate indifference requirement. To constitute deliberate indifference, the training program's inadequacy must "reflect[ ] a 'deliberate' or 'conscious' choice by a municipality...." *Harris,* 489 U.S. at 389, 109 S.Ct. at 1205. The fact that the city had a training program and policies dealing with the circumstances here at issue demonstrates, though perhaps

---

**1.** I do not mean to suggest that expert testimony is never to be given weight. However, such testimony must first disclose a proper legal ba-

sis, which Dr. Kirkham's testimony does not. In this regard, I am in agreement with the concurring opinion.

not conclusively, that the city was not deliberately indifferent to the rights of the mentally ill. Having come forward with this evidence, it is incumbent upon the plaintiffs to point to specific facts that give rise to a genuine issue of fact as to deliberate indifference. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The plaintiffs have failed to do so. Certainly, the evidence previously discussed, which relates only to the conduct of the officers, is not probative of the *city's* fault. The record also fails to disclose any evidence whatsoever of the city's attitude toward the challenged training program.

The majority's reliance on *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989), is misguided. In *Leach* the court found that the sheriff, with whom the county reposed supervisory responsibility, was deliberately indifferent because he failed to act despite the occurrence of at least fourteen instances of identical "deplorable treatment." The Supreme Court has recognized that inaction in the face of such often repeated violations can be said to be deliberate indifference. *See Harris*, 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10. In the instant case, there is no evidence of often repeated violations of the rights of furloughed psychiatric patients by police officers. Nor has the plaintiff introduced even a scintilla of other evidence that the city made a conscious or deliberate choice to be indifferent regarding its training program.

I must, therefore, respectfully dissent from the reversal of summary judgment on the inadequate training claim.