106 F.3d 402
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Johnny Lee TRENT, Plaintiff-Appellant,
v.
HAWKINS COUNTY, TENNESSEE; Hawkins County Sheriff Wayne
Clevinger; Hawkins County Deputies Brad A. Depew, Ira J.
Hines, and Jeffrey S. Greer; and other Unknown Deputies and
Police Officers, Defendants-Appellees.
 No. 96-5025.
 United States Court of Appeals, Sixth Circuit.
 Jan. 29, 1997.
 
 Before: NELSON and DAUGHTREY, Circuit Judges, and COHN, District Judge.*
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 This is an appeal from a summary judgment for the defendants in a civil rights case brought by a mentally ill person who was shot in the leg while being taken into custody by three deputy sheriffs. The county that employed the officers had given them no in-depth specialized training in dealing with the mentally ill--and the questions on appeal are (1) whether the need for such training was so obvious, and the lack of it so likely to result in constitutional violations, that a jury could properly have found the county and its policymakers guilty of deliberate indifference to the constitutional rights of those in the plaintiff's situation, and (2) if so, whether a jury could properly have found that the plaintiff's rights were violated as a proximate result of the lack of training. Concluding, upon de novo review, that neither question can be answered as the plaintiff would have us answer it, we shall affirm the judgment entered by the district court.
 
 
 2
 * On the evening of Sunday, January 30, 1994, Ms. Angela Lee Luster, the daughter of plaintiff Johnny Lee Trent, went to the Sheriff's Department of Hawkins County, Tennessee, to discuss a problem concerning her father. According to the complaint subsequently filed in this case, Ms. Luster told Sgt. Brad Depew "that her father was mentally ill, that he was a Vietnam Veteran, that he was acting strangely and that he [might] be dangerous due to his mental condition." According to a statement given by Sgt. Depew on January 31, 1994, Ms. Luster told the Sergeant "that her dad (Johnny Trent) had been threatening some guy with a gun and stated that this was the second time Trent had done this." The complaint alleges that Mr. Trent was "extremely paranoid" and was "suffering from a bipolar manic condition."
 
 
 3
 After consultation with a deputy circuit court clerk, Sgt. Depew and Ms. Luster decided to seek an emergency committal to an area mental hospital. In this connection Ms. Luster apparently signed an affidavit requesting that Mr. Trent be taken into custody for examination by a physician.
 
 
 4
 Because of Mr. Trent's previous problems, Sgt. Depew asked two other officers--Corporal Jeffrey S. Greer and Patrol Officer Ira J. Hines--to accompany him to Mr. Trent's house. Sgt. Depew rode with Corporal Greer in one cruiser, and Officer Hines took another vehicle. The three deputies arrived at the house sometime after 11 p.m. Corporal Greer pulled his cruiser into the driveway first, followed by Officer Hines. Greer left his headlights on, according to his statement, so that they illuminated the north side of the house. Mr. Trent, according to an affidavit he executed in October of 1995, was inside the house "cleaning some guns."
 
 
 5
 The officers stepped out of their cruisers and saw Mr. Trent through a window. Shouting "police" or "sheriff," they took up positions around the porch. Mr. Trent came to his front door carrying a gun pointed upwards. The officers shouted at him to drop the gun, according to their statements, and Mr. Trent's affidavit says that he turned to his right to lay the gun down. At this juncture, the affidavit continues, "I was shot by someone in the shadows to my left whom I had not seen." (The affidavit also says that "[a]t the time I had been suffering from extreme amnesia....")
 
 
 6
 The statement given by the officer who fired the shot, Sgt. Depew, indicates that although Mr. Trent had been pointing his gun in the air, he brought it down to about his waist and pointed it straight at Depew; that Depew, who could see Trent's finger on the trigger, told him again to drop the gun; that Trent did not do so; and that Depew, "very scared for my life and the lives of the other officers," then decided to fire. The shot hit Mr. Trent in the leg.
 
 
 7
 Mr. Trent pushed himself back into the house, according to his affidavit, and fired five shots into the walls "to prevent them from shooting me again." (The affidavit goes on to say that "I do not believe my thoughts were completely rational at the time due to my mental illness.") Mr. Trent eventually came out of the house with his hands up, in compliance with commands shouted by the officers, and he was taken into custody without further incident.
 
 
 8
 Almost a year later Mr. Trent instituted the present civil rights action against Hawkins County, Sheriff Wayne Clevinger, and the three deputies. By consent of the parties the case was referred to a magistrate judge for final disposition.
 
 
 9
 The defendants subsequently filed a motion for summary judgment, accompanied by affidavits from Sheriff Clevinger and Sgt. Depew. Among the facts to which the Clevinger affidavit attested were these: that the three deputies were all certified law enforcement officers, hired in compliance with official standards; that each deputy was a graduate of the Tennessee Law Enforcement Academy and had completed all necessary in-service training every year since being certified; that Tennessee law does not require that a certified law enforcement officer be given any detailed training in how to perform an emergency committal; that the Sheriff's Department handles many such committals every month; that virtually all committals have been accomplished without incident, this being the only one in which a firearm was discharged; and that "there are no prior incidents which have indicated a need for any specialized training on emergency committals."
 
 
 10
 Attached to the Clevinger affidavit was a three-page handout entitled "Handling Abnormal People;" this document was said to have been among the materials used at the Tennessee Law Enforcement Academy in 1991. Sgt. Depew, in his affidavit, said that he recalled having received a similar handout in 1989. In his deposition, excerpts from which accompanied Mr. Trent's brief in opposition to the summary judgment motion, Sgt. Depew testified that his training program involved some discussion of dealing with mentally ill people, but not a great deal. He did not recall any in-depth training on the subject. Neither of the other deputies, according to their depositions, received in-depth training on the mentally ill either. Officer Hines' deposition does refer to training with regard to Emotionally Disturbed Persons, but the training was geared toward officer protection and survival. Officer Hines was not taught anything about paranoia, he testified.
 
 
 11
 Characterizing the issue in this case as "whether the lack of specific or specialized training regarding how to take a mentally ill person into custody constitutes ... 'deliberate indifference' that amounts to a deprivation of constitutional rights," the district court (Inman, M.J.) concluded as a matter of law that no such deliberate indifference could be shown here. An order was entered granting the motion for summary judgment and dismissing the action, and the plaintiff perfected a timely appeal.
 
 II
 
 12
 Plaintiff Trent conceded at an early stage of the litigation that the defendant officers had been sued only in their official capacities. The district court therefore viewed the case, properly, as one against the county alone.
 
 
 13
 It is undisputed that a county cannot be held liable for its employees' conduct on a respondeat superior theory. See Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir.1994) (in an action brought against a municipality under 42 U.S.C. § 1983, "the doctrine of respondeat superior is inapplicable"). To recover damages from the county for his injuries, Mr. Trent would have to prove that "those injuries were the result of an unconstitutional policy or custom of the County." Matthews v. Jones, 35 F.3d 1046, 1049 (6th Cir.1994).
 
 
 14
 Where, as here, the existence of an unconstitutional policy or custom is sought to be established on the basis of an alleged deficiency in police training, liability can be established "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989) (emphasis supplied). A rule that would allow the governmental body to be held liable for any lesser degree of fault--e.g., the more relaxed rule that our own court endorsed in the decision reversed by the Supreme Court in City of Canton--would be "overly broad." Id. Liability cannot attach in a case of this type unless "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [governmental body] can reasonably be said to have been deliberately indifferent to the need." Id. at 390. And even where training deficiencies are so gross as to bespeak deliberate indifference, there can be no recovery of damages unless "the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." Matthews v. Jones, 35 F.3d at 1049 (citations omitted).
 
 
 15
 In the case at bar the plaintiff relies on an affidavit executed by Dr. George Kirkham, a retired professor at Florida State University School of Criminology and Criminal Justice, to show that the injury did indeed result from a training deficiency so obvious and so likely to cause constitutional violations that a jury could properly have found "deliberate indifference" on the part of Hawkins County's policymakers. We are not persuaded that Dr. Kirkham's affidavit was adequate to accomplish this difficult task.
 
 
 16
 Dr. Kirkham expressed the opinion that the procedures employed in taking Mr. Trent into custody--procedures characterized by the affiant as "highly confrontational and escalatory"--violated well established law enforcement standards and were foreseeably dangerous. The conduct of the three officers was "reckless," in Dr. Kirkham's view. The affiant attributed the officers' conduct to a "failure of the Hawkins County Sheriff's Department to assure that its supervisors and line officers received minimally acceptable training with respect to both recognizing and properly reacting to mentally ill individuals."
 
 
 17
 The notion that the officers did what they did in this case because of any lack of training in "recognizing" mentally ill individuals is clearly inconsistent with the record. Paragraph 6 of the plaintiff's complaint acknowledges that Angela Luster told Sgt. Depew in so many words that her father was mentally ill and might be dangerous due to his mental condition. The very reason the officers were attempting to take Mr. Trent into custody late on a Sunday evening was that his daughter had said she wanted him committed to a mental hospital on an emergency basis. Everyone was aware of Mr. Trent's previous problems, moreover, which is why no fewer than three officers went to the house where Mr. Trent was cleaning his guns. There was obviously no difficulty in "recognizing" mental illness here.
 
 
 18
 Dr. Kirkham may have been on firmer ground in his criticism of the procedures employed by the officers--and we take it as given, for summary judgment purposes, that the procedures violated established professional standards. Dr. Kirkham does not explain the basis for his conclusion that a lack of acceptable training was the proximate cause of the officers' "reckless" conduct, however, and his affidavit fails to demonstrate that a need for better training was so obvious, and the inadequacy of the training received by the officers so likely to result in violations of constitutional rights, that the policymakers of Hawkins County could reasonably be said to have been "deliberately indifferent" to the need.
 
 
 19
 From the vantage point of the policymakers, the somewhat rudimentary tutelage that Sgt. Depew and other alumni of the Tennessee Law Enforcement Academy received in "Handling Abnormal People" did not appear to have caused any difficulty in the past. It is undisputed that every month the Sheriff's Department performed "many" emergency committals of persons suspected of being mentally ill--yet never before had a serious problem arisen. And so lacking in "obviousness" was the need for more intensive training that no such training was required by Tennessee law, nor was it offered by the state law enforcement academy. If, under the facts presented here, a jury could be allowed to find the policymakers guilty of "deliberate indifference" on the strength of Dr. Kirkham's affidavit, virtually any perceived deficiency in training could result in liability in virtually any excessive-use-of-force case, it seems to us.[1] Such a broadening of governmental liability would clearly be inconsistent with the Supreme Court's opinion in City of Canton.
 
 
 20
 The decision in Russo v. City of Cincinnati, 953 F.2d 1036 (6th Cir.1992)--a case that Mr. Trent did not cite to the district court, but on which he relies heavily in his brief on appeal--does not compel a contrary conclusion. Although there are a number of similarities between that case and this one, we do not believe that the rationale on which this court reversed a summary judgment for the defendants in Russo was so broad as to necessitate reversal of the judgment entered by the district court here.
 
 
 21
 Russo was a civil rights case brought by the estate and family of a man named Thomas Bubenhofer. Although diagnosed as a paranoid schizophrenic by physicians at a psychiatric institution, Mr. Bubenhofer had been given a two-hour pass and had gone home to his apartment with his sister, Karen Russo. Mr. Bubenhofer told Ms. Russo that he did not want to return to the psychiatric institution, and he eventually locked himself in the apartment. Three officers who had heard a police radio broadcast describing Mr. Bubenhofer as "suicidal, homicidal, and a hazard to police" attempted to take him into custody. Although told by Ms. Russo that Bubenhofer was alone in the apartment and did not have a gun, the officers forced the apartment door open, stunned Mr. Bubenhofer (who was holding two butcher knives) with a series of Taser darts, and shot him a total of 22 times with their service revolvers. Mr. Bubenhofer died the next day.
 
 
 22
 One of the claims in the ensuing lawsuit was that Mr. Bubenhofer's constitutional rights had been violated as a proximate result of the defendant city's failure to train its officers adequately. In support of the contention that the officers' training was constitutionally defective, the plaintiffs offered the testimony of Dr. George Kirkham--the same expert witness whose affidavit is before us here--together with an Office of Municipal Investigation report in which the city's own investigators concluded that the training was inadequate. The district court entered summary judgment for the city on the failure-to-train claim, but a divided panel of this court reversed on the ground that there was a genuine issue of material fact. Judge Jones wrote the lead opinion, Judge Wellford concurred separately, and Judge Suhrheinrich dissented.
 
 
 23
 Focusing primarily on the question whether the plaintiffs' evidence was sufficient to suggest inadequacies in the city's training program, the lead opinion rejected an argument by the city that Dr. Kirkham's testimony should be disregarded as conclusory. "Reliance on expert testimony is particularly appropriate," the lead opinion stated, "where, as here, the conclusions rest directly upon the expert's review of materials provided by the City itself." Russo, 953 F.2d at 1047.
 
 
 24
 Judge Wellford, concurring separately, pointed out that
 
 
 25
 "[i]n order to hold the City liable, the factfinder would have to find that the inadequacy of training was so likely to result in the constitutional injury to mentally ill persons, that the City's policymakers could be deemed to be callous and indifferent to the need for training in that area.
 
 
 26
 * * *
 
 
 27
 * * *
 
 
 28
 [P]laintiff must carry the heavy burden of proving the City's alleged policy of deliberate indifference and that the deficiency, if any, was a proximate cause of the death." Id. at 1049.
 
 
 29
 Judge Wellford went on to describe testimony in which Dr. Kirkham opined that the officers' ignorance of the appropriate procedures for "barricaded person" situations was linked to inadequate training--and Dr. Kirkham's testimony, Judge Wellford indicated, was not in itself strong enough to defeat the summary judgment motion. "In my view," Judge Wellford wrote, "to maintain plaintiffs' claim against the City, plaintiffs must make a stronger showing than this." Id. (Emphasis supplied.) In light of all the evidence, however, including the report of the Office of Municipal Investigation, Judge Wellford opted "to give plaintiff the benefit of doubt" on this "close and difficult" issue. Id.
 
 
 30
 Judge Wellford's vote in Russo was the deciding one, Judge Suhrheinrich having dissented. We take it from his concurring opinion that Judge Wellford would have opted to affirm the summary judgment for the defendants if the plaintiffs had been unable to point to anything more than the testimony of Dr. Kirkham.
 
 
 31
 In the case at bar, of course, Dr. Kirkham's affidavit is essentially all the plaintiff has. Here there is nothing comparable to the report of the Office of Municipal Investigation, for example. Judge Wellford would probably characterize the present case as a close and difficult one too--a characterization with which we would agree--but the logic of Judge Wellford's concurrence in Russo, as we read it, points to affirmance of the judgment for the defendants in the case at bar.
 
 
 32
 Accordingly, and for essentially all of the reasons set forth in the opinion of Magistrate Judge Inman, as well as the reasons stated herein, the summary judgment is AFFIRMED.
 
 
 
 *
 The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Even if it could be deemed proper to let a jury find Hawkins County guilty of deliberate indifference in failing to require more or better training in dealing with the mentally ill, moreover, it is difficult for us to understand how it could have been proper to let the jury find a causal link between the quality of Sgt. Depew's training and the injury sustained by Mr. Trent. Sgt. Depew may have been mistaken when he concluded that Mr. Trent was aiming his weapon rather than laying it down, but no amount of instruction in dealing with the mentally ill could possibly insure that mistakes of this type will never occur