**Chad Timothy DICKERSON and Deon Denay Dickerson, a minor, by her mother and legal guardian, Sharon Dale Stephens, Plaintiffs–Appellees,**

v.

**Cory D. McCLELLAN and Charles L. Stevens, Individually and in their Official Capacities as Police Officers for the Metropolitan Government of Nashville and Davidson County, Tennessee, Defendants–Appellants,**

**Metropolitan Government of Nashville and Davidson County, Tennessee, Defendant.**

**No. 94–5206.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 17, 1995.

Decided Dec. 9, 1996.

1152

Jeffrey Zager (argued and briefed), Thomas H. Peebles, Trabue, Sturdivant & DeWitt, Nashville, TN, for Plaintiffs–Appellees.

James L. Charles (briefed), the Metropolitan Government of Nashville & Davidson County, Department of Law, Nashville, TN, E. Joseph Fitzpatrick, Jr. (briefed), Jones, Rogers & Fitzpatrick, Nashville, TN, William S. Helfand (argued), Hirsch, Robinson, Sheiness & Glover, Houston, TX, for Defendants–Appellants.

Before: BATCHELDER and MOORE, Circuit Judges; ENSLEN, Chief District Judge.*

MOORE, Circuit Judge.

Appellants, Officer Cory D. McClellan and Sergeant Charles L. Stevens (the "officers"), appeal the district court's denial of their motion for summary judgment based on qualified immunity in this 42 U.S.C. § 1983 action, brought by the appellees, children of Joel Dickerson who was fatally shot by McClellan when the officers responded to a "shots fired" call at his house. The plaintiffs allege Fourth Amendment violations under § 1983 premised upon the officers' failure to knock and announce their presence before entering Dickerson's residence and their claim that the officers used excessive force by shooting Dickerson. For the reasons that follow, we reverse in part and dismiss in part for lack of jurisdiction.

## I. BACKGROUND

The following facts are undisputed. At 1:00 a.m. on February 1, 1992, while en route to a call involving a drunk prowler, Officer McClellan heard the dispatcher put out a "shots fired, in progress" call in the vicinity of Harlin Drive in Nashville, Tennessee. The dispatcher stated: "Margie George is calling in from 3015. Male subject is 1042 [drunk] is inside 3011 and just fired 9 shots." The call was coded "3", the highest priority code possible. Upon arriving at the vicinity within approximately six minutes after the dispatcher's call, McClellan turned off his headlights so that he could proceed stealthily. McClellan mistakenly drove past 3011 and was flagged down by George at 3015 Harlin Drive. She confirmed that the person inside, who the officers later learned was Joel Dickerson, had fired at least nine shots and was still inside the house. McClellan did not ask George whether anyone else was inside the house or whether she had any other information about the incident.[1]

McClellan turned around, parked near the driveway of 3011 and waited for backup assistance.

Sergeant Stevens arrived to assist McClellan. McClellan relayed to Stevens that at least nine shots had been fired, that the suspect was believed to be drunk, and that he was still inside. As the officers approached the front door of Dickerson's residence, they could see that the front door was open and the storm door, which they could see through, was closed. Lights were on in the living room in the front of the house and on the front porch. The officers could not see anyone inside. They could hear one male voice yelling in a threatening tone but could not understand what he was shouting. The officers also saw a telephone cord stretched from the kitchen through the living room to the back of the house, the same direction from which the yelling emanated. Without knocking or announcing their presence, the officers entered the house with their guns drawn through an unlocked storm door at the front of Dickerson's residence. Upon opening the storm door, they smelled freshly burnt gunpowder. The officers quickly looked around the front of the house to be sure that no one was there. Stevens then moved towards the back of the house, with McClellan close behind him. As they did, they heard a man scream "I've got something for your ass" and Stevens immediately heard the cylinder close on a revolver. Stevens took cover in a position that placed him behind Dickerson as he passed. McClellan could not find immediate cover in the house, so he ran out the front door and took cover around the side of the house. Both officers heard Dickerson yell "I'll get you motherfucker" as he ran toward the front door.

The precise sequence of events at this point is disputed.[2] According to Sharon Sanford, who witnessed the incident from across

---

* The Honorable Richard A. Enslen, Chief United States District Judge for the Western District of Michigan, sitting by designation.

1. It was later determined that George did not know whether anyone else was inside the house, but she had been talking on a cordless telephone at the time with someone who knew that Dickerson was alone.

2. Because we are reviewing the denial of a motion for summary judgment, to the extent there are factual disputes, we must view the facts in the light most favorable to the plaintiffs to determine whether genuine issues of material fact preclude the grant of summary judgment based on qualified immunity.

the street, "[a]s Mr. Dickerson walked slowly toward his front door, he had his arms down by his sides" and "[b]efore Mr. Dickerson opened his front storm door and while he was still inside his house, a gunshot was fired." *See* Sanford Aff. ¶ 8–9, J.A. I. at 137. Sanford further states that "[i]n the next instant" she was "struck in the mouth by a bullet" and "observed nothing further. . . ." Sanford Aff. ¶ 10, J.A. I. at 137. In contrast, Sergeant Stevens described a different sequence of events:

> This individual [Dickerson] then exited the house in the direction of Officer McClellan whereupon I observed the individual point the blue steel, large caliber handgun towards the direction where Officer McClellan had just retreated. Upon seeing this I fired my weapon from the kitchen area towards Dickerson who was standing outside of the screen door near the front porch. ·

Stevens Am. Aff. ¶ 6, J.A. I. at 87. Officer McClellan had a similar recollection:

> The occupant of the house followed me and pointed what I knew to be a handgun at me, whereupon I fired my service weapon at the person who was pointing the handgun at me.

McClellan Aff. ¶ 6, J.A. I. at 74. McClellan fired nine times, killing Dickerson. A medical examiner confirmed that McClellan's shots inflicted the fatal wound. Stevens fired a total of four times from inside the house. One of Stevens's shots hit Sanford. Dickerson was struck with nine bullets. The officers estimated that after they arrived on the scene, this entire sequence of events took place within about one minute. McClellan Aff. ¶ 9, J.A. I. at 75; Stevens Am. Aff. ¶ 7, J.A. I. at 87.

■ After the shooting ended, McClellan recovered Dickerson's revolver, which was not cocked. Dickerson had not fired his gun at McClellan or Stevens.[3] The telephone receiver was found on the living room floor within several feet of the front door. No one else was present in the house. The officers later learned that Dickerson had been home alone arguing with his girlfriend on the telephone.

## II. PROCEDURAL HISTORY

Before trial, the district court denied the police officers' motion for summary judgment based on qualified immunity. Order dated January 12, 1994, J.A. I. at 38. The officers appealed that order, but the district court certified the appeal as frivolous, dismissed the appeal, and ordered the trial to proceed. *See Dickerson v. McClellan,* 844 F.Supp. 391 (M.D.Tenn.1994), *vacated in part,* 37 F.3d 251 (6th Cir.1994) (vacating district court's decision insofar as it "purports to dismiss the defendants' appeal"). This court denied the officers' emergency motion to stay the trial date pending appeal. *See* Order dated March 24, 1994. The jury returned a verdict in favor of both officers on the issue of whether the unannounced entry was reasonable, and returned a verdict in favor of McClellan on the issue of whether it was reasonable for him to shoot Dickerson in self-defense without attempting to warn him. J.A. IV. at 1001–02. The jury was unable to reach a unanimous verdict as to whether it was reasonable under the circumstances for Stevens to shoot Dickerson without attempting to warn him. J.A. IV. at 1002, 1004.

On May 17, 1994, a panel of this court ordered that the briefing of the defendants' qualified immunity appeal be held in abeyance pending the district court's rulings on post-trial motions. On May 20, 1994, the district court set aside the jury's verdict, ordered a new trial and returned the case to its jury docket. J.A. I. at 44. On June 16,

---

**3.** Plaintiffs presented evidence at trial suggesting that Dickerson had not discharged his gun inside his home at any time. Appellees' brief, at 19 (citing testimony of Officer John Bradford Corcoran that he found no physical evidence of projectiles in Dickerson's house when he investigated after the shooting, Tr. Vol. III at 55, J.A. VI. at 1507). However, the parties stipulated that "Mr. Dickerson fired his handgun approximately nine times during the early morning hours of February 1, 1992, prior to the arrival of the Metropolitan Police Officers." Agreed Stipulations ¶ 25, J.A. IV. at 910. Of course, we must consider only the facts the officers knew at the time of the alleged Fourth Amendment violation. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987). They had been informed by the dispatcher and again by George that the person inside Dickerson's residence had fired nine gunshots.

1994, the defendants moved this court for permission to supplement the record on appeal with evidence produced at trial and to reverse the district court's order certifying their appeal as frivolous. The defendants filed a motion to supplement the record on appeal pursuant to Federal Rule of Appellate Procedure 10(e) in the district court, as directed by the Sixth Circuit case manager, but the district court denied the defendants' motion to supplement the record on appeal without opinion. On October 14, 1994, another Sixth Circuit panel vacated the district court's decision to dismiss the defendants' appeal, finding that the district court was without authority to dismiss the appeal in the first instance. *Dickerson v. McClellan*, 37 F.3d 251 (6th Cir.1994). In a second order, which was unpublished, the same panel stayed the retrial of this action pending this appeal and ordered the parties to address in their appellate briefs whether this court should consider any evidence adduced at trial in determining the issue of qualified immunity. *Dickerson v. McClellan*, 1994 WL 577519 (6th Cir. October 14, 1994).

### III. ANALYSIS

#### A. Jurisdiction

As a threshold matter, we must determine whether we have jurisdiction to consider the officers' interlocutory appeal of the district court's denial of their motions for summary judgment based on qualified immunity. In *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817–18, 86 L.Ed.2d 411 (1985), the Supreme Court held "that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291." *Mitchell*'s holding was elaborated in *Johnson v. Jones*, — U.S. —, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), where a unanimous Supreme Court held that "a defendant, entitled to invoke a qualified-immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets

forth a 'genuine' issue of fact for trial." *Id.* at —, 115 S.Ct. at 2159. We must determine whether *Johnson* should apply retroactively because the officers filed their notice of appeal on January 20, 1994, before the Court decided *Johnson*. In *Stella v. Kelley*, 63 F.3d 71 (1st Cir.1995), the First Circuit held that *Johnson* applies retroactively to cases pending on direct appeal on the date the Court handed down its opinion because "[w]hen dealing with matters that govern a court's jurisdiction, there is no conceivable bar to retroactive application of a 'new,' judicially declared rule." *Id.* at 74. Moreover, *Johnson* applies in this case because it merely clarifies existing law. *Johnson*, — U.S. at —, 115 S.Ct. at 2156 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). *See also Behrens v. Pelletier*, — U.S. —, —, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996) (describing *Johnson* as reaffirming *Mitchell*). We therefore conclude that *Johnson* does apply to cases pending on direct appeal.[4]

The district court denied the officers' motion for summary judgment based on qualified immunity for two reasons. First, the district court found that "the actions of the officers in entering the home of Mr. Dickerson were objectively unreasonable in light of the clearly established law regarding the knock and announce rule and its exceptions." *Dickerson*, 844 F.Supp. at 392; *see also* Memorandum opinion dated January 12, 1994, at 7, J.A. I. at 29. Second, the district court held that "material factual disputes existed regarding the reasonableness of using lethal force against Mr. Dickerson." *Dickerson*, 844 F.Supp. at 392; *see also* Memorandum opinion dated January 12, 1994, at 10, J.A. I. at 32.

Because the district court reasoned that factual disputes precluded summary judgment with respect to the excessive force claim, *Johnson* appears at first blush to preclude us from exercising appellate jurisdiction on that claim. In this situation, however, we are asked to answer the purely legal question of what the clearly established law

---

4. We have previously applied *Johnson* to cases pending on direct appeal in *Christophel v. Kukulinsky*, 61 F.3d 479, 485 (6th Cir.1995), although we did not explicitly address the retroactivity issue.

was, not whether a genuine issue of fact existed or not. In such situations, *Johnson* offers the following guidance: "When faced with an argument that the district court mistakenly identified clearly established law, the court of appeals can simply take, as given, the facts that the district court assumed when it denied summary judgment for that (purely legal) reason." *Johnson,* —— U.S. at ——, 115 S.Ct. at 2159. Furthermore, we have held that "[a] defendant's right to appeal the denial of qualified immunity does not turn on the phrasing of the district court's order...." *Christophel v. Kukulinsky,* 61 F.3d 479, 485 (6th Cir.1995). Applying *Johnson* in *Christophel,* where the district court had denied the defendants' motion for summary judgment because it found that factual disputes precluded qualified immunity, we held that we could exercise appellate jurisdiction since the factual disputes were immaterial. *Id.* at 484-85. Thus, we may exercise jurisdiction over the issue of qualified immunity relating to plaintiffs' excessive force claim if it is a purely legal question, despite the district court's finding to the contrary. *See Johnson,* —— U.S. at ——, 115 S.Ct. at 2159 (explicitly rejecting the argument that such a rule would be unworkable); *Sanderfer v. Nichols,* 62 F.3d 151, 153 n. 2 (6th Cir. 1995) (finding order immediately reviewable despite district court's phrasing of its denial of qualified immunity in terms of finding more "than a scintilla" of evidence because "the plaintiff's version of events, regardless of the sufficiency of the supporting evidence, does not state a claim for such a violation.").

■ Thus, regardless of the district court's reasons for denying qualified immunity, we may exercise jurisdiction over the officers' appeal to the extent it raises questions of law. Since the facts regarding whether the officers violated Dickerson's Fourth Amendment rights by failing to knock and announce are undisputed, our jurisdiction is clear. On the other hand, we

review the excessive force claim only to determine whether, viewing the facts in the light most favorable to the plaintiffs, the officers violated Dickerson's clearly established rights.[5] If we conclude that the officers are not entitled to qualified immunity as a matter of law on the excessive force claim and that genuine issues of material fact exist, we are without jurisdiction to proceed.

**B. Denial of Qualified Immunity**

■ Turning our attention to the merits of this appeal, we must determine whether the district court erred by denying defendants' motion for summary judgment based on qualified immunity. We conduct de novo review because the issue whether qualified immunity is applicable to an official's actions is a question of law. *Daugherty v. Campbell,* 935 F.2d 780, 783 (6th Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992). In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738 (citations omitted). "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway,* 510 U.S. 510, 514, 114 S.Ct. 1019, 1022, 127 L.Ed.2d 344 (1994) (quoting *Harlow,* 457 U.S. at 806, 102 S.Ct. at 2732).

■ The first step in a qualified immunity analysis is whether, based on the applicable law, a constitutional violation occurred. *Centanni v. Eight Unknown Officers,* 15 F.3d 587, 589 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2740, 129 L.Ed.2d 860 (1994); *Silver v. Franklin Township,* 966

---

5. Furthermore, *Johnson* suggests that it is not inappropriate to review part of the district court's denial of summary judgment on qualified immunity if we find we are without jurisdiction on the excessive force portion of the appeal. In *Johnson,* the Court addressed a situation in which an appeal from denial of summary judgment based on qualified immunity involved questions of law and fact and concluded that appellate jurisdiction should be available for the portion of the appeal relating to the purely legal issue. —— U.S. at ———, 115 S.Ct. at 2158-59.

F.2d 1031, 1035 (6th Cir.1992). If we find a constitutional violation, we examine whether it involved "clearly established constitutional rights of which a reasonable person would have known." *Christophel*, 61 F.3d at 484 (citation omitted). In determining whether a constitutional right is "clearly established" at the time of the actions in question we "look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits." *Buckner v. Kilgore*, 36 F.3d 536, 539 (6th Cir.1994) (citation omitted). The standard for qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir.1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987)). Therefore, for a plaintiff to make a successful § 1983 claim, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo*, 953 F.2d at 1042. "Although it need not be the case that 'the very action in question has previously been held unlawful, ... in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039).

 Once it is determined that the right is clearly established, the court must determine "whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights." *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994). Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights. *Buckner*, 36 F.3d at 540.

### 1. Unannounced Entry Into Dickerson's Residence

 The district court held that the officers' unannounced entry into Dickerson's

home was "objectively unreasonable in light of the clearly established law regarding the knock and announce rule and its exceptions." *Dickerson*, 844 F.Supp. at 392. The district court relied upon an earlier decision of this court which stated that "[i]n the Sixth Circuit ... it is 'clearly established' law that 'the fourth amendment forbids the unannounced, forcible entry of a dwelling in the absence of exigent circumstances.'" *Hall v. Shipley*, 932 F.2d 1147, 1151 (6th Cir.1991) (quoting *United States v. Francis*, 646 F.2d 251, 258 (6th Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981)).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Sixth Circuit has long held that "the fourth amendment forbids the unannounced, forcible entry of a dwelling in the absence of exigent circumstances." *Francis*, 646 F.2d at 258.[6] Therefore, in deciding whether the district court erred in denying the defendants' motion for summary judgment based on qualified immunity, we must determine "whether an objectively reasonable officer, confronted with similar circumstances, could have reasonably believed that exigent circumstances existed" to justify noncompliance with the knock and announce rule. *Hall*, 932 F.2d at 1151. *See also O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir.1994) (holding that although defendants had violated the plaintiff's clearly established rights, an objectively reasonable officer could have believed that exigent circumstances existed and defendant officers were entitled to qualified immunity).

The Supreme Court has left "to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment." *Wilson*, — U.S. at —, 115 S.Ct. at 1919. We have recognized at least three exceptions to the knock and announce rule:

---

6. The Supreme Court recently held that "in some circumstances an officer's unannounced entry into a home might be unreasonable under the Fourth Amendment" and that the "common-law 'knock and announce' principle forms a part of the reasonableness inquiry under the Fourth Amendment." *Wilson v. Arkansas*, — U.S. —, —, —, 115 S.Ct. 1914, 1915, 1918, 131 L.Ed.2d 976 (1995).

(1) the persons within already know of the officers' authority and purpose; (2) the officers have a justified belief that someone within is in imminent peril of bodily harm; or (3) the officers have a justified belief that those within are aware of their presence and are engaged in escape or the destruction of evidence.

*Francis,* 646 F.2d at 258 (citing Justice Brennan's dissent in *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) as the source for these exceptions).[7] *See also Bates,* 84 F.3d at 795. In the instant case, the officers argue that exigent circumstances justified their failure to comply with the knock and announce rule in that they reasonably believed that compliance with the rule would have increased the risk to themselves and/or a potential victim inside Dickerson's residence.

In denying the officers' motion for summary judgment based on qualified immunity, the district court relied on *Yates v. City of Cleveland,* 941 F.2d 444 (6th Cir.1991). *Yates,* however, was an excessive force case, not a knock and announce case. Moreover, the circumstances McClellan and Stevens faced were far more serious and potentially life threatening. Thus, *Yates* is not controlling.

The officers argue that it was reasonable for them to believe that they would be placing any potential victims inside the house in greater peril by knocking and announcing their presence before entering a residence where a drunk individual was yelling in a threatening tone and had reportedly fired nine shots at a residence at 1:00 a.m. As the officers approached Dickerson's front door, they heard a loud male voice screaming but could not yet see who was in the house. The officers presumed that the shouting they heard was directed at someone in the house. Furthermore, whereas one or two shots might indicate an accidental firing, it might be reasonable to presume that a person firing nine shots in a residential neighborhood at 1:00 a.m. intended to injure someone or was out of control. Although the officers saw a telephone cord stretched towards the back of the house in the same direction as the yelling, they could have believed that a potential victim grabbed the phone to call for assistance and ran with it to the back of the house. They might also have reasonably thought that a gunshot victim or someone paralyzed by fear would not be able to speak or might not be heard above Dickerson's yelling. The officers received no report from the dispatcher or the neighbors that anyone was in the house, but neither were they informed that no one was in the house.

On the other hand, the plaintiffs note that when the officers arrived at Dickerson's house, they saw nothing unusual. The officers did not inquire whether anyone else was inside the house. When standing on Dickerson's porch, they saw no signs of struggle and saw no one in the front of the house. They heard no signs of struggle, cries for help or other sounds indicating someone had been or was being harmed. Rather, they heard a single, loud male voice that they could not understand and saw a telephone cord extended in the direction of this voice. Plaintiffs contend that the officers had no articulable facts to support their claim that

---

7. In *Ker,* eight justices held that the Fourth Amendment, made applicable to the states through the Fourteenth Amendment, governs searches and seizures conducted by state officers, but only three justices (Justices Black, Stewart, and White) joined Justice Clark's plurality opinion that the officers' failure to announce their entry was not unreasonable under the circumstances in light of the officers' belief that the defendant was in possession of narcotics, which could be quickly and easily destroyed, and because the defendant's furtive conduct in trying to elude the officers might indicate that the defendant was expecting the police. *Id.* at 40–41, 83 S.Ct. at 1633–34. Justice Harlan concurred in this result but stated that state searches and seizures should be judged under the "fundamental fairness" test embraced by the Due Process Clause of the Fourteenth Amendment. *Id.* at 44, 83 S.Ct. at 1635. Justice Brennan's opinion, joined by three other justices (Chief Justice Warren and Justices Douglas and Goldberg), concluded that the "unannounced intrusion of the arresting officers into their apartment violated the Fourth Amendment." *Id.* at 46, 83 S.Ct. at 1635–36. Although Justice Brennan recognized exceptions to the knock and announce principles required by the Fourth Amendment, he focused on the fact that the defendants in *Ker* were completely unaware of the officers' presence and that there was absolutely no activity within the apartment to justify the officers' belief that anyone was attempting to destroy evidence. *Id.* at 60, 83 S.Ct. at 1643.

1160

they feared for the safety of someone inside the house.

■ We have stated that "officers must have more than a mere hunch or suspicion before an exigency can excuse the necessity for knocking and announcing their presence." *United States v. Bates,* 84 F.3d 790, 795 (6th Cir.1996) (citations omitted). We have also cautioned that we "will closely scrutinize officers making a forced entry without first adequately announcing their presence and purpose." *Id.* (citing *United States v. Nabors,* 901 F.2d 1351, 1355 (6th Cir.), *cert. denied,* 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990)). McClellan and Stevens relied on more than a hunch. They were informed by the dispatcher that a drunk individual had fired nine gunshots minutes before their arrival. In *Bates,* we noted that "[t]he presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent." *Bates,* 84 F.3d at 795. It was not unreasonable for the officers to conclude that the firing of nine gunshots suggests a willingness to use a weapon. The district court stated that it would be reasonable to infer from the observation of a taut telephone line "that the loud voice was directed at the phone" and not necessarily to someone present in the home. *Dickerson,* 844 F.Supp. at 396 n. 5. But it is equally plausible and not unreasonable for the officers to infer that a victim grabbed the phone to call for help and either could not be heard over the shouting of the male voice or had been incapacitated by a gunshot wound. Thus, the officers had a "justified belief" that someone in the residence was in imminent peril of bodily harm. *Francis,* 646 F.2d at 258.[8] Even if the officers' belief that someone within could be in danger is a close question, the officers are entitled to the benefit of the doubt under the qualified immunity standard. *See Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam) ("[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly

incompetent and those who knowingly violate the law' ") (citation omitted).

In sum, we hold that the officers were entitled to summary judgment based upon qualified immunity with regard to the unannounced entry into Dickerson's residence because of their reasonable belief that someone inside was in imminent peril of bodily harm. We reverse the district judge's denial of summary judgment on this ground.

### 2. Excessive Force

We must next determine whether the district court erred by denying the officers' motion for summary judgment based on qualified immunity with respect to plaintiffs' claim that the officers used excessive force by shooting Dickerson. To determine whether, viewing the facts in the light most favorable to the plaintiffs, defendants are entitled to qualified immunity requires us to set out the legal standard upon which to judge the claim. As an initial matter, we must decide how broadly to view the circumstances surrounding the shooting in determining whether the officers are entitled to qualified immunity on plaintiffs' excessive force claim.

#### a. The Totality of the Circumstances

■ Plaintiffs argue that the conduct preceding the shooting is relevant to the issue of the objective reasonableness of the force. Appellees' brief, at 43–45. To the extent plaintiffs argue that McClellan and Stevens should have investigated further before approaching Dickerson's house, we note that the Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances. *See Collins v. Nagle,* 892 F.2d 489, 493 (6th Cir.1989). Plaintiffs also contend that the fact finder should consider all of the circumstances preceding the shooting in determining liability for excessive force under § 1983. Specifically, plaintiffs contend that the officers should be held accountable for creating the need to use excessive force by their unreasonable unannounced entry. The officers respond by pos-

8. Even the articulation of the exception requires only a "justified belief" and does not require knowledge or certainty of the presence of someone in danger.

ing the question whether a police officer who is negligent in performing some aspect of his pre-entry investigation "must allow an armed assailant to chase him out of the house and kill him because he created the emergency to which he had to react lethally." Appellants' brief, at 38.

The Supreme Court has instructed courts to look to the totality of the circumstances to determine whether the force used was reasonable. *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 1699–1700, 85 L.Ed.2d 1 (1985). Our present inquiry, however, is how broadly to view the circumstances relevant to the excessive force issue. Some of our cases analyze excessive force claims in segments. *See, e.g., Russo v. City of Cincinnati,* 953 F.2d 1036, 1044–45 (6th Cir.1992) (analyzing three distinct excessive force claims raised by the plaintiffs separately even though they were part of one incident: the initial use of a taser, subsequent use of the taser, and the use of deadly force); *Pleasant v. Zamieski,* 895 F.2d 272, 276 (6th Cir.) (breaking down analysis of whether the officer's actions in arresting a suspect were objectively reasonable under the circumstances into two components: whether it was reasonable for the officer to decide (1) to draw his gun and (2) not to return his gun to its holster), *cert. denied,* 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990); *Yates,* 941 F.2d at 450 (Suhrheinrich, J., concurring) (cautioning against "lumping together conduct which was allegedly a fourth amendment violation for a warrantless search ... with conduct giving rise to a fourth amendment excessive force claim" and stating that it does not "automatically follow[ ] that even if an officer's conduct was legally objectively unreasonable with respect to a search, he cannot under any circumstances acquire qualified immunity for a subsequent constitutional violation."). *See also Sampson v. Gilmere,* 476 U.S. 1124, 1125, 106 S.Ct. 1993, 1994, 90 L.Ed.2d 673 (1986) (Burger, C.J., dissenting from the denial of a certiorari petition) (stating that "an officer's conduct which makes the need for deadly force more likely does not constitutionally disable the officer from later using deadly force to defend himself.").

Other circuits have applied similar analyses in excessive force cases. In *Carter v. Buscher,* 973 F.2d 1328, 1332–33 (7th Cir. 1992), the court recognized that the Supreme Court begins its analysis by identifying the "seizure" and proceeding to examine

> whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances. In *Brower,* for instance, the question on remand was whether it was reasonable to seize a fleeing suspect with a deadman roadblock, not whether it was reasonable to pursue the suspect in a high-speed car chase.

*Carter,* 973 F.2d at 1332 (citing *Garner,* 471 U.S. at 7–12, 105 S.Ct. at 1699–1702, and *Brower v. County of Inyo,* 489 U.S. 593, 599–600, 109 S.Ct. 1378, 1382–83, 103 L.Ed.2d 628 (1989)). As the Seventh Circuit stated in *Plakas v. Drinski,* 19 F.3d 1143, (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994):

> The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Id.* at 1150. Therefore, the *Plakas* court stated that the appropriate method of analysis is to "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." *Id.* *See also Menuel v. City of Atlanta,* 25 F.3d 990, 997 (11th Cir.1994) (recognizing that "police must pursue crime and constrain violence, even if the undertaking itself causes violence from time to time" and holding that "[n]o responsible officer could disregard the palpable indications of imminent violence that pervaded the [suspect's] household"); *Drewitt v. Pratt,* 999 F.2d 774, 778–80 (4th Cir.1993) (rejecting a claim that an officer

who resorts to deadly force in self-defense nevertheless violates the Fourth Amendment if he unreasonably provokes the shooting by failing properly to identify himself as a police officer); *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir.1993) ("scrutiniz[ing] only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment" because the "Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general."); *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir.1991) (holding that *Graham's* objective reasonableness test for excessive use of deadly force requires the factfinder to focus on the very moment the officers make the "split-second judgments" and not on the events leading up to the time immediately prior to a shooting); *Sherrod v. Berry*, 856 F.2d 802, 805–06 (7th Cir.1988) (en banc) (stating that in an excessive force case courts should look to the split second before the officer had to decide what to do).[9]

Following our precedent and the analysis in *Carter*, we analyze the § 1983 claims separately in this case. Although both claims are premised on Fourth Amendment violations, the violation of the knock and announce rule is conceptually distinct from the excessive force claim. Moreover, the importance of segmenting these issues is minimized since we concluded that McClellan and Stevens are entitled to qualified immunity with respect to their unannounced entry into Dickerson's residence. Thus, in reviewing the plaintiffs' excessive force claim, we limit the scope of

our inquiry to the moments preceding the shooting.

### b. Use of Deadly Force

■ As indicated at the outset, our jurisdiction constrains us to determine only whether, viewing the facts in the light most favorable to the plaintiffs, the officers are entitled to qualified immunity because they did not violate Dickerson's clearly established constitutional right to be free from excessive force. Since we answer that question in the negative, we are without jurisdiction to proceed further.

In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395, 109 S.Ct. at 1871; *Adams v. Metiva*, 31 F.3d 375, 386–87 (6th Cir.1994) (citations omitted) ("both the right to be free from unreasonable seizures, ... and to be free from the use of excessive force under the Fourth Amendment, ... are clearly established") (internal citations omitted). Determining the reasonableness of the force used under the Fourth Amendment "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871

---

**9.** The plaintiffs cite *Rowland v. Perry*, 41 F.3d 167 (4th Cir.1994), to support their view that excessive force claims should not be segmented. The *Rowland* panel, of which Retired Associate Justice Powell was a member, stated that "[t]he better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." *Id.* at 173. Although the court stated that each distinct act of force became reasonable in light of what the officer knew at each point in the progression of events, the court held that the officer was not entitled to qualified immunity because it concluded that "a man suffered a serious leg injury over a lost five dollar bill." *Id.* at 174. *Rowland* conflicts with our precedent in *Russo*, which

analyzed the progressive escalation of force at each step in the sequence of events. Moreover, the *Russo* analysis may apply in the instant case if it is determined that the officers' initial decision to shoot was reasonable under the circumstances but there was no need to continue shooting at Dickerson. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir.1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."); *Hopkins v. Andaya*, 958 F.2d 881, 887 (9th Cir.1992) (dividing episode into two segments and holding that even if the use of deadly force was justified initially, "the exigency of the situation lessened dramatically" and second use of deadly force was unreasonable), *appeal after remand*, 29 F.3d 632 (9th Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995).

(citation omitted). In conducting this analysis, we are mindful that

> [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97, 109 S.Ct. at 1872. Moreover, we have noted that under *Graham*

> we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Smith v. Freland,* 954 F.2d 343, 347 (6th Cir.), *cert. denied,* 504 U.S. 915, 112 S.Ct. 1954, 118 L.Ed.2d 557 (1992).

The plaintiffs argue that as early as 1984, this circuit has held that persons have a clearly established right not to be shot unless they posed a threat to a pursuing officer or others. *Yates,* 941 F.2d at 447. The officers counter that the law is clearly established that if a suspect threatens an officer with a weapon or threatens another person with serious physical harm or death, deadly force is authorized in self-defense or defense of another person. *Garner,* 471 U.S. at 11–12, 105 S.Ct. at 1701 ("if the suspect threatens the officer with a weapon ... deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."). Both statements of the law are correct. When the facts are viewed in the light most favorable to the plaintiffs, there was evidence that Dickerson had simply walked slowly to the front door, with his hands at his side, and that he was shot while still inside his house before he opened his door. (Sanford Aff. ¶¶ 8–9, J.A. I. at 137). On this view of the facts, the officers are not entitled to qualified immunity as a matter of law.

The district court denied summary judgment on the excessive force issue because it found that material issues of fact existed regarding the sequence of events immediately preceding the shooting. *Dickerson,* 844 F.Supp. at 397. The district court noted that Stevens offered inconsistent statements on the crucial question of whether he saw Dickerson point his gun at McClellan. Compare Stevens Am. Aff. ¶ 6, J.A. I. at 87 (stating that he saw Dickerson's gun being aimed at Officer McClellan before he fired his weapon), with Stevens Dep. at 62–63, J.A. I. at 203–04 (stating that he was unsure what Dickerson was doing with the gun as he exited the house and that he could not see McClellan at that time). Moreover, there is a factual dispute as to the timing of the first gunshot. Stevens testified in his deposition that he fired when Dickerson was on the porch and that he did not hear any shots before he fired. Stevens Dep. at 59, 62, J.A. I. at 200, 203. McClellan testified in his deposition that Dickerson was in the process of shutting the door behind him and pointing his gun at McClellan when McClellan shot him. McClellan Dep. at 88–89, J.A. I. at 308–09. On the other hand, Sharon Sanford, who lived directly across the street from Dickerson, stated in her affidavit that "[a]s Mr. Dickerson walked slowly toward his front door, he had his arms down by his sides" and "[b]efore Mr. Dickerson opened his front storm door and while he was still inside his house, a gunshot was fired." Sanford Aff. ¶¶ 8–9, J.A. I. at 137. Thus, according to Sanford, Dickerson was still inside the door when the officers began to shoot. In addition, Plaintiffs offered the expert opinion of Leonard Territo, a professor of Criminology and former patrol officer and detective, that "Sergeant Stevens acted in an objectively unreasonable manner and utilized excessive force in discharging his firearm at Joel William Dickerson's back without ever attempting to announce his presence or to is-

sue a warning." Territo Aff. ¶ 11, J.A. I. at 135.[10] Because material issues of fact precluded the grant of summary judgment based on qualified immunity on plaintiffs' excessive force claim, we are without jurisdiction to review this issue.

We are also without jurisdiction to review Stevens's alternative argument that plaintiffs cannot prove proximate cause, an essential element of a § 1983 violation, because the medical examiner and ballistics expert established that no bullet Stevens fired killed Dickerson, i.e., he missed his target. Since this case is before us as an appeal pursuant to *Mitchell* from a denial of summary judgment based on qualified immunity, we should not address the separate issue of proximate cause.

Our review under *Johnson v. Jones* is limited to whether, based on the undisputed facts, the officers violated Dickerson's clearly established right to be free from excessive force by shooting Dickerson. Because it is not clear when the officers began to shoot, whether Dickerson pointed his gun at McClellan before the officers shot him, and whether a warning was feasible, we are without jurisdiction to proceed.

#### c. Record on Appeal

McClellan and Stevens argue that the evidence introduced at trial should be included in the record on appeal.[11] The officers' notice of appeal, however, referred only to the district court's denial of their motion

for summary judgment entered January 12, 1994. J.A. I. at 45. We have previously held that "when reviewing a summary judgment decision, an appellate court must confine its review of the evidence to that submitted to the district court." *Bush v. Rauch*, 38 F.3d 842, 846 (6th Cir.1994). After the trial, Stevens and McClellan moved pursuant to Federal Rule of Appellate Procedure 10(e) [12] to supplement the record on appeal "to include the trial transcript and exhibits of the March 29, 1994, trial of this case." J.A. IV. at 1034.[13] The officers cite *O'Neill v. Town of Babylon*, 986 F.2d 646 (2d Cir.1993), where the Second Circuit reversed the denial of qualified immunity based on evidence introduced at trial even though the district court had granted a new trial. *Id.* at 649–51. But the officer in *O'Neill* appealed the denial of his Rule 50 motions for judgment as a matter of law, *id.* at 648, and the Second Circuit held that it could decide the qualified immunity issue as a matter of law. *Id.* at 649. The Second Circuit based its decision on undisputed testimony presented at trial. *Id.* at 650.

The procedural posture of this case is troubling. Through no fault of their own, the officers were denied their right under *Mitchell* to an immediate appeal of the denial of summary judgment based on qualified immunity because of the erroneous district court ruling certifying their appeal as frivolous and dismissing their appeal, and this court's subsequent denial of their emergency motion to stay the trial. *See* part II *supra.* They

10. The district court states in a footnote to its January 12, 1994 opinion that it is possible that Dickerson was not armed. J.A. I. at 32. This suggestion is unsupported by the record. As the district judge states, there is no evidence that the gun was a plant. Although her affidavit does not mention a gun, Sanford did not state that Dickerson did not have a gun. In fact, she was struck by a stray bullet after the first shot and never saw Dickerson walk through the front door.

11. Since the facts involved in the unannounced entry into Dickerson's home are undisputed, the issue of the scope of the record on appeal relates only to the excessive force claim.

12. Courts of Appeals have authority to supplement the record with evidence introduced at trial pursuant to Fed. R.App. P. 10(e), which provides that:

If any difference arises as to whether the record truly discloses what occurred in the district court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the district court either before or after the record is transmitted to the court of appeals, or the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the court of appeals.

13. The district court denied this motion without opinion. J.A. IV. at 1036.

were forced to go to trial. The jury returned a verdict for both officers on the unannounced entry issue and for Officer McClellan on the excessive force · issue, and remained hung regarding the excessive force claim against Stevens. The district court, however, solely on the basis that the verdict as to the unannounced entry issue was a miscarriage of justice, set aside the jury's verdict in its entirety, and ordered a new trial. Under these circumstances we can empathize with the officers' desire to have us consider the trial testimony notwithstanding that that evidence was not available to the district court when it ruled on the summary judgment motion we are now reviewing. We are constrained to point out, however, that the order granting a new trial is not a final appealable order, and the appeal of the denial of summary judgment is the only matter before us.

We need not decide here whether a court of appeals may ever consider trial testimony in reviewing a district court's earlier denial of summary judgment based on qualified immunity. Here the officers have identified no undisputed evidence introduced at trial indicating that Dickerson aimed his gun at McClellan before the officers shot Dickerson. Sharon Sanford's trial testimony is consistent with her affidavit on this crucial issue. She testified that the last thing she remembered prior to being shot was seeing Dickerson "right at the door looking like he was fixing to walk out of it" but that he had not come out of the door. Sanford Tr. Vol. III at 49, · J.A. VI. at 1501. Moreover, she testified that Dickerson was "walking at a normal pace towards the door" in a "[v]ery laid back" manner and that "[h]is arms were down by his side." Sanford Tr. Vol. III at 20–21, J.A. VI. at 1472–73.[14] Thus, in this case consideration of trial evidence and testimony would not resolve the factual dispute critical to a determination of whether the officers are entitled to qualified immunity that precluded the grant of summary judgment before trial.

14. Although on cross examination, the officers attorneys attempted to undermine her credibility by pointing out that she had been awake for twenty-two straight hours, that there was a large tree in her front yard, and that she had a pending

## IV. CONCLUSION

Accordingly, we **REVERSE** the district court's denial of the officers' motion for summary judgment based on qualified immunity with respect to plaintiffs' claim that the officers' unannounced entry into Dickerson's residence violated his Fourth Amendment rights. However, we **DISMISS** the officers' appeal of the district court's denial of their · motion for summary judgment based on qualified immunity on plaintiffs' excessive force claims because we are without jurisdiction in light of the existence of material issues of fact. *See Johnson v. Jones, —— U.S. at ——, 115 S.Ct. at 2159.*

lawsuit of her own against McClellan and Stevens, Sanford Tr. Vol. III at 27, 39, 46, J.A. VI. at 1479, 1491, 1498, we do not resolve credibility issues on appeal.